FILED
2017 Oct-27  PM 07:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **JILL KILEY, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **Civil Action No.:** |
| | ) | |
| **MEDFIRST CONSULTING** | ) | **2:17-cv-01756-RDP** |
| **HEALTHCARE STAFFING, LLC.,** | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| Defendant. | ) | |
| | ) | |
| | ) | |

## OPPONENT MEDFIRST'S RESPONSIVE SUBMISSION IN RESPONSE TO MOVANT'S MOTION FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION AND COURT-SUPERVISED NOTICE PURSUANT TO 29 U.S.C. § 216(B)

## Table of Contents

I.    INTRODUCTION ................................................................................................. 1

II.   FACTS ................................................................................................................ 2

III.  ARGUMENT ..................................................................................................... 7

    A. Plaintiffs misstate the legal standard.............................................................. 7

    B. The individualized analysis under the "economic realities test" precludes conditional certification. ................................................................................................ 10

    C. Plaintiffs fail to demonstrate that the Consultants are similarly situated such that judicial economy would be promoted by collective treatment. .................................... 12

    D. Plaintiffs propose an improper notice and notice procedure. ......................... 17

        1.   Plaintiffs' proposed procedure includes an excessively long opt-in deadline and an unnecessary and misleading reminder. ....................................................... 18

        2.   The proposed notice rests on an incorrect statute of limitations................... 19

        3.   Plaintiffs' request for email notice should be denied.................................... 19

        4.   Plaintiffs' request for notice by text message should be denied.................... 20

        5.   Plaintiffs' proposed notice is overly solicitous, one-sided and misleading. ................. 21

IV.   CONCLUSION ................................................................................................. 24

Defendant MedFirst Consulting Healthcare Staffing, LLC ("MedFirst") hereby responds to Plaintiffs' Motion for Conditional Collective Action Certification and Court-supervised Notice Pursuant to 29 U.S.C. § 216(b) (ECF No. 50; "Motion").  MedFirst's Response is supported by this memorandum and the declarations of Russel Nance, Brian Smith, Christal Kulungian, Rashanda Ray, Donna Seales, Ramkhi Singh, and Kristi Vaughn.

## I.    INTRODUCTION

Conditional certification under 29 U.S.C. § 216(b) is fraught with abuse.  In many cases, lawyers use it as a fishing expedition to stir up litigation at the employer's expense.[1]  In others, conditional certification serves merely as a tool to leverage settlement.[2]  Plaintiffs' Motion raises all of these concerns.

With this Motion, Plaintiffs request permission to text message and email blast 908 individuals "who were classified as independent contractors while performing consulting work for MedFirst" during the last three years ("Consultants").  *See* Doc. 50-2, p. 1; Declaration of Brian Smith, ¶ 4.  The only unifying characteristic between these individuals, however, is their lawful status as independent contractors.  In fact, the nationwide, project-based business of MedFirst results in an incredibly wide range of duties and working experiences for contractors,

---

[1] *See, e.g., Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1275 (M.D. Ala. 2004) ("courts, as well as practicing attorneys, have a responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation"); *Sloane v. Gulf Interstate Field Servs.*, No. 4:16-cv-01571, 2017 U.S. Dist. LEXIS 43088, at *69-70 (M.D. Pa. Mar. 24, 2017) (same) (quoting *Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 929-30 (D. Ariz. 2010)); *Collazo v. Forefront Educ., Inc.*, No. 08-cv-5987, 2010 U.S. Dist. LEXIS 7661, at *8 (N.D. Ill. Jan. 28, 2010) ("Plaintiffs' Motion … appears to be little more than a speculative fishing expedition."); *Bouthner v. Cleveland Constr., Inc.*, No. RDB-11-0244, 2012 U.S. Dist. LEXIS 28497, at *17 (D. Md. Mar. 5, 2012) (denying conditional certification and acknowledging the court's responsibility to prevent a "frivolous fishing expedition conducted by the plaintiff at the employer's expense.").

[2] *See, e.g., Novick v. Shipcom Wireless, Inc.*, No. 4:16-cv-0730, 2017 U.S. Dist. LEXIS 55699, at *15-18 (S.D. Tex. Apr. 12, 2017) (denying conditional certification; acknowledging the Court's role of ensuring the collective action process is "being used appropriately to promote judicial efficiency, rather than used as a tool to burden a defendant and create settlement pressure."); *accord Rahman v. Fiesta Mart, LLC*, No. H-15-2295, 2016 U.S. Dist. LEXIS 59091, at *9-10 (S.D. Tex. May 4, 2016).

as diverse as the knowledge, experience and skills of the contractors themselves. For this reason – and because the law requires putative collective members to be "similarly-situated,"[3] and because the applicable economic realities test is highly fact-specific[4] – Plaintiffs' Motion should be denied.

## II.    FACTS

From its headquarters in Birmingham, MedFirst staffs hospitals, clinics and other healthcare facilities around the country, on a project basis, with specialized information technology consultants skilled in implementing industry-specific software and training healthcare personnel on its use. (*See* Smith Declaration, ¶ 3). During the putative class period, MedFirst has staffed 165 projects across 31 different states for all sorts of clients, from large hospital systems to small outpatient health clinics. (*See* Smith Declaration, ¶¶ 3, 5). Each project is unique, and varies depending on the type of the facility, the department or "units" which need consulting services, the software being implemented, the healthcare personnel being trained, and the scope and duration of the training and support, among other factors. (*See* Smith Declaration, ¶ 6).

For any given project, MedFirst's role is limited in large part to connecting the clients with the right Consultants. (*See* Smith Declaration, ¶ 3). At the outset, the client identifies the software (*e.g.*, EPIC, Cerner, All Scripts, McKesson), the module of software being implemented, the units of the facility subject to the training (*e.g.,* emergency room, client registration/intake, oncology department), the scope of the work (*e.g.*, classroom training, report writing, design customization), a start date, the anticipated duration of the project, and the

---

[3] *Dybach v. State of Fla. Dep't of Corr.* 942 F.2d 1562, 1567-68 (11th Cir. 1991).

[4] Courts use the multi-factor "economic realities test" to determine employee status. *Perdomo v. Ask 4 Realty & Mgmt., Inc.*, 298 F. App'x 820, 821 (11th Cir. 2008).

specific number of Consultants requested.  (*See* Smith Declaration, ¶ 7).

From there, MedFirst searches its network to find the best blend of Consultants to meet the project's needs.  (*See* Smith Declaration, ¶ 7).  Often, MedFirst then presents a list of potential Consultants and their diverse qualifications in a spreadsheet to the client for approval. (*See* Smith Declaration, ¶ 7, Ex. A).  While all Consultants have the background to train certain personnel on specific modules of software – whether acquired through formal schooling, certifications or just on-the-job experience at other companies – the nature and depth of their knowledge, experience and skill varies widely from consultant to consultant.  (*See* Smith Declaration, ¶ 8).

Consultants, many of whom operate their own business entities, are free to accept or decline any consulting project.  (*See* Smith Declaration, ¶¶ 8, 9; Kulungian Declaration, ¶ 4; Seales Declaration, ¶¶ 3, 5; Singh Declaration, ¶ 3; Vaughn Declaration, ¶ 5).  If they accept, the Consultant enters into a project-specific Independent Contractor Agreement outlining the "Statement of Work" being promised, expected and delivered on a short-term hourly basis.  (*See* Smith Declaration, ¶ 10; Ex. B, Sample Agreements).  Projects generally last only a few weeks or months, with the level of staffing drastically declining in the first week or so.  (*See* Smith Declaration, ¶ 13; Kulungian Declaration, ¶ 8; Singh Declaration, ¶ 3; Vaughn Declaration, ¶ 6). Therefore, most Consultants perform their services for multiple staffing companies in the industry – not just MedFirst – bouncing from project to project, contract to contract, facility to facility and location to location around the country.  (*See* Smith Declaration, ¶ 9; Kulungian Declaration, ¶ 2; Ray Declaration ¶ 2; Seales Declaration, ¶ 3; Singh Declaration, ¶ 2; Vaughn Declaration, ¶ 2).[5]

---

[5] MedFirst has never enforced a restrictive covenant in any Independent Contractor Agreement to prevent a Consultant from working elsewhere.  (*See* Smith Declaration, ¶ 9).  Notably, Plaintiffs' declarants confirm the mere

After the team is assembled for a project, the Consultants arrive on site trained and ready to use their pre-existing expertise, and often their own tools (such as laptops and smart phones), to meet the time-sensitive nature of the work. (*See* Smith Declaration, ¶ 12; Vaughn Declaration, ¶ 9). Once the project starts, MedFirst's role is limited. (*See* Smith Declaration, ¶ 11). MedFirst helps arrange travel and housing for the Consultants, and advises when and where to report for the project. (*See* Smith Declaration, ¶ 11; Kulungian Declaration, ¶ 9; Vaughn Declaration, ¶ 8). MedFirst ordinarily provides no formal training or orientation to Consultants beyond conveying logistics on how to submit their time, simply reminding Consultants to act professionally on site, and occasionally introducing a few policies or practices that the client maintains and prefers Consultants to follow.[6] (*See* Nance Declaration, ¶ 2; Kulungian Declaration, ¶ 9; Singh Declaration, ¶ 5; Vaughn Declaration, ¶¶ 4, 8). More often, the client conducts its own orientation with the Consultants after they arrive to familiarize them with the particular logistics of the healthcare community that they are temporarily joining. (*See* Nance Declaration, ¶ 2; Kulungian Declaration, ¶ 10; Seales Declaration, ¶ 9; Vaughn Declaration, ¶¶ 4, 10). Because the client is different from project to project, the existence and nature of the client's policies and practices also vary from project to project. (*See* Nance Declaration, ¶ 3; Kulungian Declaration, ¶ 10; Seales Declaration, ¶ 9; Vaughn Declaration, ¶ 10).

The Consultants' day-to-day interactions are directly with the client and the other Consultants on the project. (*See* Nance Declaration, ¶ 5; Ray Declaration ¶ 6; Vaughn Declaration, ¶ 12). Thus, the Consultants' duties and working conditions vary widely from project to project. (*See* Nance Declaration, ¶ 5; Kulungian Declaration, ¶¶ 6, 7, 10; Ray

---

existence of restrictive covenants, but say nothing of their compliance or any enforcement of the covenants. (*See* Kiley Dec., ¶ 7; Payne Dec., ¶ 7).

[6] Some clients have basic policies – such as dress codes, parking rules, smoking policies, HIPAA protocol and

Declaration ¶¶ 3, 4, 6; Seales Declaration, ¶¶ 7, 8, 9; Singh Declaration, ¶¶ 3, 4, 7; Vaughn Declaration, ¶ 6, 7, 10, 11, 12, 13, 14).  Every project is different because each client has specific needs, facilities, budgets and other constraints, individualized software systems and associated IT needs, and simply because projects are unfolding in real time, requiring adjustments on the fly. (*See* Nance Declaration, ¶¶ 4, 5).  For example, Consultants working at inpatient hospitals may work 12-hour shifts, 7 days per week, whereas Consultants working in outpatient or "ambulatory" health clinics ordinarily only work during clinic business hours, 5 days per week. (*See* Nance Declaration, ¶ 4; Kulungian Declaration, ¶ 10; Seales Declaration, ¶ 9; Singh Declaration, ¶ 7; Vaughn Declaration, ¶ 11).  Some clients require Consultants to wear identifying badges or vests, while others do not.  (*See* Nance Declaration, ¶ 3; Kulungian Declaration, ¶ 10; Seales Declaration, ¶ 9; Vaughn Declaration, ¶ 10).  Dress codes and security protocols also vary between healthcare facilities.  (*See* Nance Declaration, ¶ 3; Kulungian Declaration, ¶ 10; Seales Declaration, ¶ 9; Vaughn Declaration, ¶ 10).  There is simply no uniformity from client to client.  (*See* Nance Declaration, ¶ 5; Kulungian Declaration, ¶ 7; Ray Declaration ¶¶ 4, 5; Seales Declaration, ¶¶ 7, 8; Singh Declaration, ¶ 6; Vaughn Declaration, ¶ 12).

The roles filled by the Consultants also differ based on many factors, including the knowledge, experience and skill of the Consultant.  (*See* Nance Declaration, ¶¶ 6, 7; Kulungian Declaration, ¶ 6; Ray Declaration ¶¶ 4, 5, 6; Seales Declaration, ¶¶ 4, 5; Singh Declaration, ¶¶ 4, 5; Vaughn Declaration, ¶¶ 3, 12, 13).  A "Report Writer" Consultant, for example, must know how to extract data from IT systems and prepare reports.  (*See* Nance Declaration, ¶ 6; Singh Declaration, ¶ 4).  "Architects" customize the software application, including its functionality,

---

security procedures – that they ask Consultants to follow.  (*See* Nance Declaration, ¶ 3).

based on the needs of the client.  (*See* Nance Declaration, ¶ 6; Singh Declaration ¶ 4).  Other Consultants, referred to as "Trainers," develop PowerPoint materials and deliver presentations in front of large groups of people.  (*See* Nance Declaration, ¶ 6; Kulungian Declaration, ¶ 6; Ray Declaration ¶ 5; Singh Declaration, ¶ 4; Vaughn Declaration, ¶ 12).  "Proctors" provide individualized assistance during classroom training.  (*See* Nance Declaration, ¶ 6; Kulungian Declaration, ¶ 6; Vaughn Declaration, ¶ 12).  Other Consultants provide support and troubleshooting "at-the-elbow" of the staff *outside* the classroom – with further differentiation based on the unit within the healthcare facility and the personnel being trained.  (*See* Nance Declaration, ¶ 7; Kulungian Declaration, ¶ 6; Ray Declaration ¶ 5; Seales Declaration, ¶ 5; Singh Declaration, ¶ 4; Vaughn Declaration, ¶ 12, 13).  An "at-the-elbow" Consultant supporting staff at the patient-registration desk in a hospital works with different software (and modules within the software), performs different duties, and uses different skills than a Consultant training physicians in the emergency department.  (*See* Nance Declaration, ¶ 7).

Finally, the scope of a Consultant's project can also vary widely depending on the progress of the project and the budget of the client.  (*See* Smith Declaration, ¶ 14).  Named Plaintiff Jill Kiley's experience on the SkyLakes Hospital project in Klamath Falls, Oregon, is a good example.  While most projects last a matter of weeks, Kiley worked at SkyLakes for 13 months, several of them as the only Consultant.  (*See* Smith Declaration, ¶ 14).  In that period, she negotiated an increase in her rate several times.  (*See* Smith Declaration, ¶ 14, Ex. C, Email Negotiation).  Named Plaintiff Marcus Payne, by contrast, worked the SkyLakes project from 7/30/15 to 9/10/15 – only six weeks at a single rate.  (*See* Smith Declaration, ¶ 14).

MedFirst does not independently track, evaluate or discipline the Consultants' performance in any sense, formal or informal.  (*See* Nance Declaration, ¶ 8; Kulungian

Declaration, ¶ 11).   For example, scope of work or timing issues are often negotiated and resolved by the Consultant directly with the client.   (See Nance Declaration, ¶ 8; Ray Declaration, ¶ 6).  If a client needs additional Consultants in a particular department, it may ask a Consultant to report elsewhere, but the Consultants are always free to decline.  (See Nance Declaration, ¶ 8; Ray Declaration, ¶ 6).   Typically, either the client or the Consultant – not MedFirst – decides when to terminate the relationship.[7]   (See Nance Declaration, ¶ 8; Ray Declaration, ¶ 3).

## III.  ARGUMENT

Plaintiffs' Motion fails for two simple reasons: (1) the highly fact-intensive economic realities test precludes conditional certification; and (2) the 908 putative collective members are far from similarly-situated.  Even if conditional certification is proper (which it is not), Plaintiffs' proposed notice and notice procedure are flawed in several respects and would need to be substantially modified.

### A.  Plaintiffs misstate the legal standard.

While the Eleventh Circuit has suggested that district courts use a "two-tiered approach" to determine whether certification is warranted[8] -- the Eleventh Circuit has also acknowledged that "[n]othing in our circuit precedent … requires district courts to utilize [the two-tiered approach]."  *Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1219 (11th Cir. 2001).  Even where the two-tiered approach is utilized, courts recognize that "conditional certification at the first stage is by no means automatic," as Plaintiffs seem to suggest.  *See Sloane v. Gulf Interstate*

---

[7] Frequently, the client requests a high volume of Consultants for the initial roll-out or "Go-Live" of a software system, and then chooses which Consultants to keep longer-term based on the project's evolving needs and the skillsets required.  (See Smith Declaration, ¶ 13).

[8] At the initial stage, the district court evaluates the *Dybach* elements under a lenient standard.  *Hipp v. Liberty Nat'l Life Ins. Co., supra,* 252 F.3d at 1217.  At the second stage, the Court re-evaluates the similarly-situated inquiry after discovery has taken place and presumably revealed more information regarding the plaintiff's claims.  *Id.* at

*Field Servs.*, No. 4:16-cv-01571, 2017 U.S. Dist. LEXIS 43088, at *69-70 (M.D. Pa. Mar. 24, 2017) ("the district court cannot function as a rubber stamp for any and all claims that come its way under this statute.") (*quoting Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 929-30 (D. Ariz. 2010)); Doc. 50, p. 3:7-9.

To invoke the opt-in mechanism provided in 29 USC § 216(b), Plaintiffs must carry the burden of demonstrating that the putative collective action members are "similarly situated." *Hipp*, 252 F.3d at 1217. To meet this standard, Plaintiffs must make a factual showing that is backed by evidence, not just speculation. *Symczyk v. Genesis Healthcare Corp.*, 656 F. 3d 189, 193 (3d Cir. 2011) (*reversed on other grounds in Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523 (2013)); *McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 443 (S.D.N.Y. 2012) ("'[T]he burden is not non-existent and the factual showing, even if modest, must still be based on some substance'") (*quoting Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 480 (S.D.N.Y. 2010)); *Young v. Cerner Corp.*, 503 F. Supp. 2d 1226, 1229 (W.D. Mo. 2007) (Plaintiffs "must present more than mere allegations; i.e., some evidence to support the allegations is required.").

As this Court has noted, "the burden is on the plaintiffs to make an evidentiary showing that they and the proposed class are similarly situated, not on the defendants to disprove such similarity." *Saxon v. Title Max of Ala., Inc.*, 431 F. Supp. 2d 1185, 1188 (N.D. Ala. 2006) (quoting *Reed v. Mobile County Sch. Sys.*, 246 F. Supp. 2d 1227, 1232 (S.D. Ala. 2003)). This requires "'detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary." *Demauro v. Limo, Inc.*, No. 8:10-cv-413-T-33AEP, 2011 U.S. Dist. LEXIS 1229, at *8 (M.D. Fla. Jan. 3, 2011).

---

1218.

Ultimately, "[t]he decision to create an opt-in class under § 216(b) … remains soundly within the discretion of the district court." *Hipp,* 252 F.3d at 1219; *see also Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 169 (1989) (district courts "have *discretion*, in appropriate cases … to implement" the collective action mechanism under Section 216(b) …"). "The power to authorize notice must, however, be exercised … only in appropriate cases." *Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1233 (M.D. Ala. 2003); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1268 (M.D. Ala. 2004) (same) (*citing Haynes v. Singer Co.*, 696 F.2d 884, 886 (11th Cir. 1983)). And, the collective action mechanism is appropriate only if it will result in the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged … activity." *Hoffman-LaRoche*, *supra,* 493 U.S. at 170.

Here, Plaintiffs have interpreted this standard to mean they simply need to ask for conditional certification based on their legal theory of misclassification. *See* Doc. 50, p. 3:7-9 ("at this early stage of the litigation, Plaintiffs need only show that they are … subject to a single decision, policy or plan that allegedly violates the law."). Plaintiffs are incorrect. Courts have soundly rejected the notion that the alleged misclassification of workers alone justifies certification. *See, e.g., Palacios v. Boehringer Ingelheim Pharms., Inc.,* 2011 U.S. Dist. LEXIS 92002, at *19 (S.D. Fla. Apr. 18, 2011) ("a defendant's policy and practice of classifying a group of employees as exempt is not a basis for proceeding collectively"); *Colson v. Avnet, Inc.*, 687 F. Supp. at 929 ("[T]he mere classification of a group of employees – even a large or nationwide group – as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members "similarly situated" for § 216(b) purposes."); *Moore v. PNC Bank, N.A.*, No. 2:12-cv-1135, 2013 U.S. Dist. LEXIS 74845, at *14 (W.D. Pa. May 29, 2013) ("Courts have readily exercised discretion and denied

9

conditional certification motions when plaintiffs have relied on a common exemption status as the factor that binds a putative class together."). Applying the *correct* standard, in fact, "courts in this Circuit and others have typically denied collective certification of FLSA actions which allege employee/independent-contractor misclassification." *See Carrera v. UPS Supply Chain Solutions,* No. 10-60263, 2012 U.S. Dist. LEXIS 192917, *31 (S.D. Fla. 2012); *Demauro,* 2011 U.S. Dist. LEXIS 1229, at *11.[9]

### B.    The individualized analysis under the "economic realities test" precludes conditional certification.

The FLSA applies only where an employer-employee relationship exists. 29 U.S.C. §§ 206-207. Where independent contractor status is questioned, courts use the "economic realities test" to determine whether an employment relationship exists. *Perdomo v. Ask 4 Realty & Mgmt., Inc.,* 298 F. App'x 820, 821 (11th Cir. 2008). Under this test, courts weigh multiple factors: (1) the nature and degree of the defendant's control as to the manner in which the work is performed; (2) the plaintiff's opportunity for profit or loss depending on his managerial skill; (3) the plaintiff's investment in equipment or materials, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the defendant's business. *Parilla v. Allcom Constr. & Installation Servs., LLC,* 2009 WL

---

[9] Further, this Court and sister courts have not hesitated to deny conditional certification where plaintiffs did not meet their burden of showing they were similarly situated to the proposed class. *See, e.g. Saxton v. Title Max of Ala., Inc.,* 431 F. Supp. 2d 1185, 1188-9 (N.D. Ala. 2006) (Proctor, J.) (denying conditional certification); *Walker v. Jefferson Cty. Bd. of Educ.,* No. 2:13-CV-524-RDP, 2016 U.S. Dist. LEXIS 36699, at *26 (N.D. Ala. Mar. 22, 2016) (Proctor, J.) (denying conditional certification; "judicial economy will not be promoted if the court permits Plaintiffs to transmit notices and attempt to secure consents from persons whose claims are inherently dissimilar to those advanced by Plaintiffs in this action."); *Wombles v. Title Max of Ala., Inc.,* No. 3:03-cv-1158-C, 2005 U.S. Dist. LEXIS 34733, *18 (M.D. Ala. Dec. 7, 2005) ("[A]ny determination about whether an employee was properly classified as an exempt employee must be an individualistic, fact-specific determination.... Given the state of the evidence, certifying a collective action in this case would undermine, rather than promote, judicial efficiency."); *Reed v. Mobile County Sch. Sys.,* 246 F. Supp. 2d 1227, 1233 (S.D. Ala. 2003) (denying motion for conditional certification due to overbreadth of proposed class).

2868432, at *2 (M.D. Fla. Aug. 31, 2009).  No factor is dispositive and courts must consider the totality of each plaintiff's circumstances.  *Id.*

Based on the fact-intensive and highly individualized nature of the economic realities test, courts have concluded that independent contractor misclassification allegations "eviscerate[] all notions of judicial economy that would otherwise be served by conditional class certification."  *Demauro*, 2011 U.S. Dist. LEXIS 1229, at *13.  In *Demauro*, drivers in Florida attempted to conditionally certify a nationwide class of all the defendants' independent-contractor drivers.  *Id.* at *4.  The Court held that the economic realities test "precluded" conditional certification:

> Although each Plaintiff and opt in driver have the same position ..., the individualized analysis needed to determine whether each driver is an independent contractor or employee for FLSA purposes precluded class certification. *** The economic realities test is fact intensive and requires individualized analysis.  Accordingly, a number of courts have determined that whether an individual is an independent contractor or an employee is not appropriate for determination on a class-wide basis.

*Id.* at *11.  On this basis, and without "detailed analysis," the district court denied the plaintiffs' motion for conditional certification of both the local and national class of drivers.  *Id.* at *13 ("It is not necessary ... for the Court to provide detailed analysis of each factor"); *see also West v. Verizon,* 2009 U.S. Dist. LEXIS 82665, at *12 (M.D. Fla. Jul. 20, 2009) ("The need for individualized inquiries would contravene the basic theory of judicial economy upon which the certification of collective actions is based.").

Similarly, in *Pfaahler v. Consultants for Architects, Inc.*, No. 99 C 6700, 2000 WL 198888, at *1 (N.D. Ill. Feb. 8, 2000), the court denied conditional certification based on the individualized inquiries required by the economic realities test.  There, the defendant placed architects with local firms on a contractual basis.  *Id.*  The plaintiff claimed he was similarly

11

situated to potential class members because they were all misclassified as independent contractors and denied overtime pay. *Id.* at \*4. Denying conditional certification, the court reasoned:

> [Plaintiff] has failed to demonstrate any basis for a finding that he is similarly situated with other potential claimants. Liability in [Plaintiff]'s case will turn on whether [Plaintiff] is an "independent contractor" or an "employee" within the meaning of the FLSA. The same is true for every potential claimant included in the collective action . . . ***In order to determine who is an independent contractor and who is an employee, the court would be required to make a fact-intensive, individual determination as to the nature of each potential claimant's relationship with [defendant] … Where this is the case, certification of a collective action under the FLSA is inappropriate.***

*Id.* at \*2 (emphasis added).

Here, as in *Demauro* and *Pfaahler*, the same tortured process would be required. Indeed, this case has the added layer of complexity from the fact-intensive exemption analysis under 29 U.S.C. §213(a)(17) (computer workers), particularly the Consultants that perform the "Architect" function. Given the need and predominance of individualized inquiries under the economic realities test, Plaintiff's Motion should be denied.

**C.      Plaintiffs fail to demonstrate that the Consultants are similarly situated such that judicial economy would be promoted by collective treatment.**

To grant Plaintiffs' Motion, this Court must be satisfied that the case is "manageable as a collective action." *Bennett v. Hayes Robertson Group, Inc.*, 880 F. Supp. 2d 1270, 1284-85 (S.D. Fla. 2012) (denying conditional certification where "several individualized issues … render[ed] the group unmanageable as a collective class"); *Shim v. Echosphere, L.L.C.*, 2010 U.S. Dist. LEXIS 135984, at \*5-6 (S.D. Fla. Dec. 20, 2010) (denying conditional certification to a putative class of cable technicians given "significant individual considerations" which would "likely multiply if the Court conditionally certified a nationwide class" and would "not promote judicial and litigant economy, which are, of course, the *raison d'etre* of the § 216(b) collective

12

action").  To this end, the Court must determine whether the proof to demonstrate that the consultants are "employees" can be applied to the putative collective as a whole.  *Palacios, supra,* 2001 WL 6794438, at *6 ("If the ultimate issue to be determined is whether the Defendant properly classified each employee as exempt under the FLSA, the 'similarly situated' inquiry must include an analysis of each putative plaintiff's job duties . . . [which] necessarily involves a fact-by-fact inquiry.").  As the Supreme Court noted, in addressing commonality, "[w]hat matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011); *see, e.g., Ruiz v. Serco, Inc.,* No. 10-cv-394-bbc, 2011 U.S. Dist. LEXIS 91215, **18-19 (W.D. Wis., Aug. 5, 2011) (declining to conditionally certify based on *Dukes*); *Macgregor v. Farmers Insurance Exchange,* 2:10-CV-03088, 2011 U.S. Dist. LEXIS 80361, *13-15 (D.S.C. July 22, 2011) (refusing to issue notice based on *Dukes*).

In this case, any attempt to extrapolate from one project to another, or one consultant to another, would be misguided and futile.  During the putative class period, the putative collective members, who possess a wide range of knowledge, experience and skills, worked in 165 locations in 31 states.  In each instance, they worked in different environments, doing different duties, and doing it with different clients – each of which has its own respective needs, organizations, IT systems, facilities, personnel, policies, procedures, practices, etc.  No two Consultants are alike, and no two projects are alike.  The enumerable variations in job duties and working conditions alone compel the individualized analysis of the economic realities test for each Consultant, and "eviscerate[] all notions of judicial economy that would otherwise be

13

served by conditional class certification." *Demauro*, 2011 U.S. Dist. LEXIS 1229, at *13. That much is clear from the Declarations of Smith, Nance, Seales, Kulungian, Ray, Vaughn, and Singh.

Incredibly, Plaintiffs urge the Court to find that a nationwide collective of 908 Consultants from 165 projects in 31 states are similarly situated to Plaintiffs' 4 declarants ("Declarants") from approximately 9 projects in 6 states. (*Compare* Smith Declaration, ¶ 5 *with* Kiley Declaration, ¶ 5; Payne Declaration, ¶ 5; Chinda Declaration, ¶ 5; Bahta Declaration, ¶ 5). This is absurd. Even Plaintiffs' own Declarants highlight key differences between Consultants.

First, the Declarants worked in different locations. Named Plaintiff Jill Kiley ("Kiley") worked on projects in Klamath Falls, Oregon, Winston-Salem, North Carolina, and Pittsburgh, Pennsylvania (*see* Kiley Declaration, ¶ 5) while Named Plaintiff Marcus Payne ("Payne") worked in Medford, Oregon, Klamath Falls, Oregon, and Vincennes, Indiana (*see* Payne Declaration, ¶ 5). Opt-in Plaintiff Linda Chinda ("Chinda") worked in Pittsburgh, Pennsylvania, Alabaster, Alabama, and Salt Lake City, Utah (*see* Chinda Declaration, ¶ 5), and Opt-in Plaintiff Thomas Bahta ("Bahta") worked in Pennsylvania, North Carolina, and Indiana (*see* Bahta Declaration, ¶ 5). Clearly, Plaintiffs' own witnesses worked in different environments with different clients during different time periods.

Second, the Declarants' projects varied in duration. Kiley alleges that her "shortest assigned project lasted a month; the longest project lasted 13 months." (*See* Kiley Declaration, ¶ 6). By contrast, Payne's "project assignments lasted from about a month to two months." (*See* Payne Declaration, ¶ 6). Chinda and Bahta both testified that their project assignments were even shorter, usually lasting two to three weeks. (*See* Chinda Declaration, ¶ 6; *See* Bahta Declaration, ¶ 6).

<u>Third</u>, the Declarants admit that they worked varying hours.  Kiley and Payne testified that a typical project required them to work 12 hours per day, 7 days per week.  (*See* Kiley Declaration, ¶ 6; *See* Payne Declaration, ¶ 6).  Chinda testified that a typical project required her to work "5 to 7 days per week."  (*See* Payne Declaration, ¶ 6).  In contrast, a typical project required Bahta to "work 5 days per week, 45 – 50 hours per week."  (*See* Bahta Declaration, ¶ 6).  When you compare these variances to the Declarations of Seales, Kulungian, Ray, Vaughn, and Singh, it becomes clear that damage calculations alone bar a finding of similarly-situated and the collective treatment of this case.  *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (certification improper because plaintiffs fell "far short of establishing that damages are capable of measurement on a classwide basis" and, as a result, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class.").

In addition to the vacillating affirmative allegations of the Declarants, the testimony submitted by Plaintiffs also contains several glaring omissions of significance.  For example, Kiley contends that "MedFirst trained me in the exact way that they wanted me to train . . ." (*see* Kiley Declaration, ¶8) and Bahta parrots the very same assertion.  (*See* Bahta Declaration ¶ 7) ("MedFirst trained me in the exact way they wanted me to train . . .").  Yet, Chinda and Payne make no mention whatsoever of any training conducted by MedFirst about how to perform their services, and certainly not training on the "the exact way" they must do it.  *See* Payne Declaration, generally; Chinda Declaration, generally.  Similarly, Chinda and Bahta declared that they were required to wear vests (*see* Chinda Declaration, ¶ 10; Bahta Declaration, ¶ 9) [10] – whereas Kiley and Payne conspicuously omit any assertion about mandatory uniforms or the like.  *See* Kiley Declaration, generally; Payne Declaration, generally.  Similarly, Kiley and Payne

---

[10] Neither suggests that MedFirst required the attire, or that the clients required it on every project.  (*See* Chinda Declaration, ¶ 10; Bahta Declaration, ¶ 9).

15

both claim that they were "supervised by [an unnamed MedFirst manager] who worked for MedFirst, and would report back to MedFirst [on their] job performance . . ." *See* Kiley Declaration, ¶10; Payne Declaration ¶ 10. By contrast, Chinda and Bahta were unwilling to repeat the same representation. *See* Chinda Declaration, generally; Bahta Declaration, generally. In short, Plaintiff's own evidence confirms the unavoidable fact that MedFirst Consultants are far from similarly-situated and cannot be lumped into a nationwide collective.

With a record like this, courts have routinely denied certification. For example, in *Carrera*, the court decertified the collective action based on "critical dissimilarities in the evidence." 2012 U.S. Dist. LEXIS 192917, at *31. The court determined that the contractors were not similarly situated with respect to factors considered in the independent contractor/employee analysis such as control over the work performed and "degree of permanency and duration of the working relationship." *Id.*

Here, as there, "the degree of permanency and duration of the working relationship" varies widely. For example, Named Plaintiffs Kiley and Payne had vastly different experiences on the project in Klamath Falls, Oregon, where Kiley worked for 13 months and Payne worked for only 6 weeks. (*See* Smith Declaration, ¶ 14). Rashanda Ray has contracted with MedFirst on "nearly 100 projects for MedFirst over the past six (6) years," with "[t]he longest project … last[ing] between two (2) and three (3) years," while occasionally working for other companies in the industry. (*See* Ray Declaration, ¶¶ 2, 3). Chistal Kulungian, on the other hand, has worked "about 15 projects for MedFirst" since March 2014, with the "the shortest project … last[ing] 2 weeks and [the] longest project last[ing] about 3 months," while working for two other companies in the industry. (*See* Kulungian Declaration, ¶¶ 2, 5, 8). The dissimilarities speak for themselves.

16

The Eastern District of Pennsylvania's decision in *Bamgbose v. Delta-T Group, Inc.* 684 F. Supp. 2d 660 (E.D. Pa, 2010) is on point.  In *Bamgbose*, as here, the plaintiff alleged that the defendant, a temporary staffing agency, misclassified him and other healthcare workers as independent contractors.  *Id.*  Like MedFirst, the defendant was a staffing company that places contractors in various facilities based on the needs of the client.  *Id.*  Like MedFirst's Consultants, the healthcare workers possessed a variety of educational backgrounds and skill sets, making them qualified for different client opportunities.  *Id.*  Despite the submission of 23 declarations from the plaintiff, the court denied conditional certification.  *Id.* at 666.  In so doing, the court explained that it could not "only look to [defendant's] uniform classification of workers or its common payment procedures, intranet, and telephone systems[].  Instead, it must determine whether the proof to demonstrate that the workers are 'employees' or 'independent contractors' can be applied to the class as a whole." *Id.* at 668-69.   On this question, the court found a collective action "[im]possible":

> "Evaluation of whether the healthcare workers are employees or independent contractors, based on the current record, would not be possible on a collective basis because it would require the Court to examine the healthcare workers' distinct relationships with [defendant] *and its various clients*."

*Id.* at 669 (emphasis added; citing *Pfaahler, supra*).  The same result is required here.

### D.     Plaintiffs propose an improper notice and notice procedure.

The "power to authorize notice is discretionary and should be exercised only in 'appropriate cases'—that is, in cases where the plaintiffs have made a threshold showing that they meet the criteria in § 216(b)." *Simmons v. Valspar Corp.*, No. 2011 U.S. Dist. LEXIS 39340, at *18 (D. Minn. Apr. 11, 2011) (internal citations omitted).  Even if Plaintiffs have carried their burden (which they have not), the Court has broad discretion to shape the opt-in notice and notice procedure to ensure that the litigation is conducted in an "orderly and sensible"

17

manner and the putative class members do not receive "misleading communications." *Hoffman-LaRoche*, *supra,* 493 U.S. at 170, 172 ("By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative" which "may avoid the need to cancel consents obtained in an improper manner."). In this case, Plaintiffs propose a notice and notice procedure that are flawed in several respects.

### 1.     Plaintiffs' proposed procedure includes an excessively long opt-in deadline and an unnecessary and misleading reminder.

Plaintiffs propose an opt-in deadline of 90 days. (*See* Doc. 50, p. 19:12). That is excessive. A 30-day period is more than sufficient to provide the putative class with time to file their consent forms, while providing MedFirst with notice of the scope of the action within a reasonable period of time. Courts in the Eleventh Circuit have routinely ruled that 45-day (and shorter) notice periods are appropriate for FLSA collective actions. *See, e.g., Bell v. MYNT Entm't, LLC*, 223 F.R.D. 680, 683 (S.D. Fla. 2004). This case should be no expectation.

Plaintiffs also request a "reminder" 45 days prior to the close of the notice period. (*See* Doc. 50, p. 19:19-20). This is not only suggestive, but also unnecessary (both because the period must be shorter than requested and because a single notice is enough). "In facilitating notice, the Court must avoid communicating to absent class members any encouragement to join the suit or any approval of the suit on its merits." *Hoffman-La Roche, supra,* 493 U.S. at 168-69. A reminder would have exactly this effect. *Wolfram v. PHH Corp.,* No. 1:12-cv-599, 2012 U.S. Dist. LEXIS 181073, at *13 (S.D. Ohio Dec. 21, 2012) ("Many courts have rejected reminder notices, recognizing the narrow line that divides advising potential opt-in plaintiffs of the existence of the lawsuit - and encouraging participation"); *Fenley v. Wood Grp. Mustang, Inc.,* 170 F. Supp. 3d 1063, 1074-75 (S.D. Ohio 2016) ("the Court should be hesitant to authorize

duplicative notice because it may unnecessarily 'stir up litigation' or improperly suggest the Court's endorsement of Plaintiff's claims.").

### 2.     The proposed notice rests on an incorrect statute of limitations.

The FLSA statute of limitations does not guarantee a three-year notice period in all cases. The FLSA provides for a statute of limitations of two years for all violations except for those deemed *willful*. 29 U.S.C. §255(a). It is Plaintiffs' burden to demonstrate that any alleged violation of the FLSA was "willful." *Turner v. Aldo US, Inc.*, No. 8:08-cv-1062-T-30MAP, 2009 U.S. Dist. LEXIS 69913, at *11-12 (M.D. Fla. Aug. 10, 2009) (acting "unreasonably but not recklessly" does not constitute willfulness); *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 358 (4th Cir. 2011) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988)) ("Negligent conduct is insufficient to show willfulness.").

Here, there is absolutely no evidence supporting a claim for a willful violation. (*See* Doc. 50, p. 17:25-26). Certainly, the mere allegation that MedFirst misclassified Consultants is insufficient. For this reason, the notice period should only be two years. *Mathews v. ALC Ptnr., Inc.*, No. 2:08-CV-10636, 2009 U.S. Dist. LEXIS 75097, at *23 (E.D. Mich. Aug. 24, 2009) (where "there [was] much less showing of willfulness," court explained that "rather than invite persons to file a lawsuit only to quickly dismiss them on statute-of-limitations grounds," it would "direct notice only to exempt employees who worked for [defendant] within a two-year limitations period.").

### 3.     Plaintiffs' request for email notice should be denied.

Plaintiffs seek permission to send their notice not only by first class mail, but also by email. (*See* Doc. 50, p. 18:14-15). Tellingly, Plaintiffs offer no reason why the Court should take this extraordinary measure in this case. The courts, of course, routinely reject delivery of the notice beyond first class mail. *See, e.g., Shaia v. Harvest Mgmt. Sub LLC*, 306

F.R.D. 268, 276 (N.D. Cal. 2015) (Finding "names and mailing addresses will provide the best means of contact.   There is no requirement that [defendant] provide e-mail addresses."); *McKeen-Chaplin v. Provident Sav. Bank,* No. 2:12-cv-3035, 2013 U.S. Dist. LEXIS 113654, at *24 (E.D. Cal. 2013) (where notice and reminder notice by U.S. Mail had been authorized, court found that additional notice by email was not necessary).   In fact, many courts find that the use of email and text messages compromise the "integrity of the notice process." *Reab v, Elec. Arts, Inc.* 214 F.R.D. 623, 630-31 (D. Col. 2002) (rejecting email notice due to the heightened risk that such communication could be reproduced, forwarded or posted to internet sites, compromising the integrity of the notice process; finding that first class mail is reliable and controlled and "maximizes the integrity of the notice process"); *Espenscheid v. DirectSat USA, LLC,* No. 09-cv-625, 2010 U.S. Dist. LEXIS 55578, at *41 (W.D. Wis. 2010) ("I agree [that] caution [should] be used in allowing email notification because of the potential for recipients to modify and re-distribute email messages.   In some circumstances, email notification may be necessary to reach potential class members.   Plaintiffs have provided no reason why it is necessary in this case. Thus, plaintiffs may not send the notice form by email and defendants are not required to provide email addresses …").   For this same reason, Plaintiffs' request for the production of email addresses would be an unnecessary invasion of privacy, and should be denied.

### 4.      Plaintiffs' request for notice by text message should be denied.

Plaintiffs also look to blast the class with text messages.   (*See* Doc. 50, p. 18:14-15). Here again, Plaintiffs provide no basis for this measure. *See McCoy v. RP, Inc.,* No. 2:14-cv-3171, 2015 U.S. Dist. LEXIS 142521, *15 (D.S.C. 2015) (finding plaintiff had not demonstrated a special need for text message notice simply because the putative class of restaurant servers was "migratory in nature"); *Aguirre v. Tastee Kreme #2, Inc.,* No. H-16-2611, 2017 U.S. Dist. LEXIS 83944, at *22-23 (S.D. Tex. 2017) (although the court acknowledged the pervasiveness of text

messaging in society and recognized that courts in other jurisdictions had allowed text message notices, it found notice by text message was not warranted and could be misleading, as there was a risk it would be incomplete, not providing a full picture or conveying the seriousness of the communication); *Brandenbug v. Cousin Vinny's Pizza, LLC,* No. 3:16-cv-516, 2017 U.S. Dist. LEXIS 129955, at *18 (S.D. Ohio, 2017) (notice via text message was premature and could only be used if plaintiffs could show that notice via mail was insufficient as to a given potential class member; the court explained that "a message with a link to a URL containing the actual notice and Consent to Join form – is so cumbersome as to be invasive."); *Taylor v. AutoZone, Inc.* No. cv-10-8125, 2011 U.S. Dist. LEXIS 55590, at *16 (D. Ariz. 2011) (permitting notice by mail only; "[t]he production of addresses is appropriate, but in the interest of protecting class members' privacy, we will not order defendant to provide telephone numbers and social security numbers. Such information is sensitive, and putative class members may have provided personal data to defendant with the expectation of confidentiality"); *Stickle v. SCI Western Mkt. Support Ctr., L.P.* No. 08-083, 2009 U.S. Dist. LEXIS 97735, at *23-24 (D. Ariz. 2009) (finding "the best practicable notice is first class mail" and refusing to require defendants to provide notice by email or publication in defendant's employee newsletter; "Because notice will be accomplished via first class mail, there is no need to provide Plaintiffs with the telephone numbers of all of the potential conditional class members."). For this reason, also, Plaintiffs' request for the production of telephone numbers only serves to invade the privacy of hundreds of people, and should be denied.

**5.      Plaintiffs' proposed notice is overly solicitous, one-sided and misleading.**

Obviously, the opt-in notice must be neutral. *Hoffman-LaRoche*, *supra,* 493 U.S. at 174 (court must "take care to avoid even the appearance of judicial endorsement of the merits of the

action" and "must be scrupulous to respect judicial neutrality"). Plaintiffs' proposed notice, however, fails to meet even the most basic standards of neutrality. The notice, for example, places the word Consultant in quotations to suggest some sort of skepticism and then, in the next paragraph, frames the lawsuit from only one side and spins the Plaintiffs' allegations as true:

> ... Plaintiffs allege that MedFirst violated the federal Fair Labor Standards Act ... because it has *improperly classified its consultants* as independent contractors, and, as a result, has *failed to pay them overtime compensation* ...

(*See* Doc. 50-2 (emphasis added)). For all we know from this description, Defendants may have already agreed in principle to the "settlement that may be entered in the consultants' favor." *Id.* Compare Plaintiffs' proposal to the following more neutral, two-sided statement:

> Plaintiffs allege that MedFirst violated the federal Fair Labor Standards Act ... by classifying its consultants as independent contractors and paying consultants a flat hourly rate without overtime. MedFirst contends that its classification is accurate and its pay practices lawful, and denies the allegations of the lawsuit in their entirety.

*Id.* Also, the names and contact information of MedFirst's counsel should be included in any notice, just like Plaintiffs' counsel. *See Libront v. Columbus McKinnon Corp.*, No. 83-858, 1984 U.S. Dist. LEXIS 21259, at *4-5 (W.D.N.Y. Dec. 13, 1984) (requiring the notice to list contact information for defense counsel).

The notice also dangles the prospect of a financial recovery without explaining the flip side − *i.e.*, that the Consultants may bear costs in the event of an unfavorable judgment. (*See* Doc. 50-2) (encouraging the return of the form "to ... obtain a portion of any judgment ... in the consultants' favor"). This is improper. *See, e.g. Behnken v. Luminant Mining Co., LLC*, 997 F. Supp. 2d 511, 524 (N.D. Tex. 2014) (proposed notice did "not apprise potential opt-in plaintiffs that they may be required to pay taxable court costs if the judgment [was] unfavorable to them" and therefore was "not completely accurate as to the potential liabilities for those who join the

22

lawsuit, [because] it omit[ted] information that would be necessary for someone to make an informed decision about whether to join the lawsuit"); *Graham v. Jet Specialty, Inc.*, No. MO-15-CV-135-DAE, 2016 U.S. Dist. LEXIS 3420, at *19 (W.D. Tex. Jan. 11, 2016) ("Courts may require a Plaintiff in an FLSA collective action to amend a proposed notice form to inform opt-in plaintiffs of their potential financial liability in the event of an unfavorable judgment.").

Also, Plaintiffs omit any mention of the Consultants' rights to engage counsel of their own choosing, or to proceed *pro se*.  By doing so, the notice suggests that the only way to exercise one's rights is by hiring Plaintiffs' counsel. *See Libront*, 1984 U.S. Dist. LEXIS 21259, at *4-*5 (requiring notice to clearly inform potential opt-ins of his right to retain own counsel); *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 91, 108 (requiring plaintiff to insert language clearly advising potential opt-ins of their right to obtain their own counsel and contact information for defense counsel and explaining that the court had not made any determination about the merits of the case).

Last, the proposed notice carries the appearance of judicial endorsement or sponsorship by including the following heading:

United States District Court for the District of Oregon
Kiley, et al. v. MedFirst Consulting, LLC
CIV. A. NO. 1:17-cv-00470

(*See* Doc. 50-2).  A simple heading such as "Notice of Pendency of a Lawsuit" would suffice, and would avoid the improper suggestion. *See Prentice v. Fund for Pub. Interest Research, Inc.*, C-06-776SC, 2007 U.S. Dist. LEXIS 71122, at *14 (N.D. Cal. Sept. 18, 2007) ("Including the full caption may give a false impression of judicial endorsement of Plaintiffs' position where none exists," and the fact that the notice would "include a statement of judicial neutrality would not, alone, be enough to cure this defect, as the caption would appear at the top of the Notice and

give the wrong impression almost immediately."). To compound the issue, the notice goes on to reiterate that "[t]his is a court-authorized notice," and then repeats "[t]his notice has been authorized by the United States District Court," in boldface no less, as if this is the most significant information on the notice. The suggestion is both obvious and improper. *See Hoffman-LaRoche, supra,* 493 U.S. at 174 (court must "take care to avoid even the appearance of judicial endorsement of the merits of the action" and "must be scrupulous to respect judicial neutrality").

## IV.    CONCLUSION

Plaintiffs seek conditional certification of a nationwide collective based on the thinnest of evidence, in a case where certification could hardly be less appropriate. For this reason, and those stated above, Plaintiffs' Motion should be denied. In the event that notice is ordered, Plaintiffs' proposed notice and notice procedures must be substantially modified.

Dated this 27th day of October, 2017

s/Stacey T. Bradford
Stacey T. Bradford
LITTLER MENDELSON, P.C.
420 20th Street North, Suite 2300
Birmingham, AL  35203
Telephone: 205.421.4700
Facsimile: 205.421.4669
Email: sbradford@littler.com

One of the Attorneys for Defendant
MedFirst Consulting Healthcare Staffing,
LLC

24

CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Allen Brantley "Josh" Bennett
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North,
Suite 2400
Birmingham, Alabama 35203
jbennett@maynardcooper.com

David M. Blanchard
Blanchard & Walker, PLLC
221 North Main Street
Suite 300
Ann Arbor, MI 48104
Phone:734-929-4313

Matthew W. Stiles
Alabama Bar No.: ASB-2429-E63S
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North, Suite 2400
Birmingham, Alabama 35203
mstiles@maynardcooper.com

Eric Lechtzin
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Phone:215-875-3000 Ext.3038
Fax: 215-875-4604

John A. Berg
Littler Mendelson, PC
121 SW Morrison Street
Suite 900
Portland, OR 97204
Phone: 503-221-0309
Fax: 503-242-2457

Harold L Lichten
Lichten & Liss-Riordan, P.C.
729 Boylston St., Suite 2000
Boston, MA 02116
Phone: 617-994-5800
Fax: 617-994-5801
Email: hlichten@llrlaw.com

Beth Ann Creighton
Creighton & Rose, PC
Powers Building
65 SW Yamhill Street, Suite 300
Portland, OR 97204
Phone: 503-221-1792
Fax: 503-223-1516

Olena Savytska
Lichten & Liss-Riordan, P.C.
729 Boylston Street
Suite 2000
Boston, MA 02116
Phone: 617-994-5800
Fax: 617-994-5801
Email: osavytska@llrlaw.com

Daniel C. Tai
Blanchard & Walker, PLLC
221 North Main Street
Suite 300
Ann Arbor, MI 48104
Phone: 734-929-4313

Sarah R Schalman-Bergen
BERGER & MONTAGUE PC
1622 Locust Street
Philadelphia, PA 19103
Phone: 215-875-3053
Fax: 215-875-4604
Email: sschalman-bergen@bm.net

25

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants.

    None.

s/Stacey T. Bradford
OF COUNSEL
